[No. B136973. Second Dist., Div. Six. June 26, 2001.]

ROBERT LeVINE, Plaintiff and Respondent, v.
CHARLES WEIS, as Superintendent, etc., et al., Defendants and
Appellants.

## COUNSEL

Pollak, Vida & Fisher, Girard Fisher and Daniel P. Barer for Defendants and Appellants.

Diane M. Matsinger for Plaintiff and Respondent.

## OPINION

**GILBERT, P. J.**—In *LeVine v. Weis* (1998) 68 Cal.App.4th 758 [80 Cal.Rptr.2d 439], we held plaintiff could state a cause of action for wrongful termination against a governmental entity under the False Claims Act. (Gov. Code, § 12650 et seq.)[1] We reversed summary adjudication dismissing plaintiff's action. The subsequent jury trial resulted in a judgment in favor of plaintiff in the amount of $627,207, plus attorney's fees in the amount of $241,957. Defendants Office of Ventura County Superintendent of Schools (VCSS) and individual supervisors employed by VCSS appeal.

We conclude that the False Claims Act imposes liability on the employer but not on individual supervisors acting for the employer. We reverse as to individual employees of VCSS. In all other respects we affirm.

### FACTS

In 1993, Robert LeVine began work at the McBride School at Ventura County Juvenile Hall. Juveniles at McBride who were considered too dangerous to be let out of the units in which they were housed, were taught within the units. Classrooms in each of the four housing units were collectively called the "Unit School." LeVine was the only teacher for between 90 and 120 students spread among the four locked classrooms.

The McBride School, including the Unit School, is operated by VCSS. From the first few months of LeVine's employment he met regularly with the VCSS's court schools director, Philip Gore, and complained about the lack of staffing. Gore said LeVine would have to work on a mission statement before they could discuss staffing. It took several months for Gore to approve the mission statement. When Gore finally approved it, he told LeVine "We don't have the money [for additional staffing]."

---

[1]All statutory references are to the Government Code unless otherwise stated.

Like other California schools, the McBride School receives money from the state based on the average daily attendance (ADA). A former Unit School teacher testified that simple mathematics showed ADA money generated by the Unit School was not being spent there.

In August of 1994, LeVine wrote to Superintendent Charles Weis complaining about the lack of staffing. LeVine's letter included a memorandum in which he stated his intention to "move to whatever level in the state or federal government is necessary to have these matters effectively resolved." The memorandum recommended that VCSS "follow-up . . . to insure the law is being complied with."

Dale Strayhorn was appointed principal in October of 1994. At a staff meeting held on December 14, 1994, LeVine asked Strayhorn why the most profitable program in court school history could not afford to have teaching personnel in each unit. LeVine threatened to contact the state Department of Education if he did not get an acceptable answer. Strayhorn became upset and began yelling. She told LeVine not to do something he would be sorry for. Strayhorn ended the meeting and stormed out of the room.

LeVine received a memorandum from Strayhorn dated December 19, 1994. The memorandum purported to reflect LeVine's comments at the December 14 meeting. It characterized LeVine's threat to bring unit school staffing matters to the attention of the Department of Education as a refusal to cooperate with Strayhorn to resolve the problem. The memorandum stated it would be placed in LeVine's personnel file.

On December 20, 1994, Strayhorn called the assistant superintendent, Sandra Shakelford, concerning LeVine. Shakelford sent VCSS's human resources director, Cary Dritz, to Strayhorn's office. Shakelford told Dritz to evaluate the situation and remove LeVine, if necessary.

LeVine was supervising a basketball game when he was told Strayhorn wanted to talk with him. When he arrived in Strayhorn's office, Dritz was there. LeVine tape-recorded the conversation. Strayhorn told LeVine that correctional staff had reported he was acting irrationally. She ordered him to go home for the rest of the week on sick leave. She said he could come back when he had a note from his doctor saying he was capable of coming back to work. Strayhorn refused to tell LeVine the person who had reported irrational behavior. Shakelford admitted that she ratified the actions of Strayhorn and Dritz.

No correctional staff member testified he or she told Strayhorn that LeVine was acting irrationally. The two persons Strayhorn identified in her deposition as having told her so, denied it. Members of the staff testified that LeVine was not behaving irrationally.

LeVine filed a grievance with the teachers union. On January 9, 1995, LeVine met with Dritz and the union president. After the meeting, Dritz sent LeVine a memorandum. The memorandum claimed that LeVine had agreed to return to work under nine conditions. The conditions included: 1) remain calm in a crisis; 2) listen without becoming defensive; 3) avoid "win-lose" conflicts; 4) maintain a "problem solving orientation"; 5) be courteous and considerate; 6) show respect for people in authority; 7) maintain a spirit of collegiality; 8) report all problems to the site administrator; and 9) communicate regularly with the site administrator.

LeVine denied that the parties ever reached an agreement. He refused to return to work under the conditions.

By letter, dated January 23, 1995, Dritz notified LeVine that unless he returned to work on January 23, 1995, his position would be terminated. Dritz sent the letter to LeVine's attorney. LeVine said he was not surprised that the letter was sent on the same day he was required to return to work. He believed it was consistent with the type of behavior he had experienced since he had been at the Unit School.

LeVine wrote to Dritz asking to be placed on leave. LeVine believed it would be better for future employment if his contract was allowed to expire instead of having his employment terminated. Weis determined, however, that LeVine's employment should be terminated for abandoning his position. On February 7, 1995, Dritz wrote to LeVine notifying him that his employment had been terminated.

LeVine did not have full-time employment for the next two years. Finally, in February of 1997, he obtained employment with the Los Angeles County Office of Education, teaching at a juvenile hall. In August of 1997, Dritz notified the California Commission on Teacher Credentialing that LeVine had abandoned his job. Weis was aware of and approved of Dritz's action. The commission rejected the charge but the charge caused LeVine to be unemployed for seven months without pay.

The state Department of Finance investigated the McBride School's claim for ADA funds. The investigation resulted in a letter to Weis. The letter stated that VCSS had no lawful basis for receiving state ADA funds in the absence of a showing that "each pupil was under the immediate supervision and control of an appropriately certified teacher" The letter concluded, "In summary, Mr. Weis, it would appear that your office has received state funds on the basis of reported ADA that does not comply with the law. . . ."

The Department of Education disagreed with the Department of Finance whether immediate supervision by a certified teacher was necessary to claim

ADA funds. At the time of trial, each classroom in the Unit School had its own teacher.

The jury found VCSS, Weis, Dritz, Shakelford and Strayhorn liable for violation of the False Claims Act. The jury awarded LeVine $350,000 for emotional distress, $86,158 for lost backpay and $50,000 for other economic loss. The trial court doubled the award of backpay and added interest pursuant to section 12653, subdivision (c). The total award was $627,207. The trial court also awarded $241,975 in attorney's fees pursuant to section 12653, subdivision (c).

DISCUSSION

I

The False Claims Act concerns claims made against the state or any of its political subdivisions for money, property or services. (§ 12650, subd. (b)(1).) The act provides for civil penalties against a person who, among other matters, "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval." (§ 12651, subd. (a)(1).)

Section 12653, subdivision (b), provides: "No employer shall discharge, demote, suspend, threaten, harass, deny promotion to, or in any other manner discriminate against, an employee in the terms and conditions of employment because of lawful acts done by the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under Section 12652 [to enforce the False Claims Act]."

II

VCSS contends the False Claims Act does not apply to it. VCSS concedes that in *LeVine v. Weis, supra,* 68 Cal.App.4th 758, we determined that the act did apply. Nevertheless, it urges us to reconsider the matter in light of *Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765 [120 S.Ct. 1858, 146 L.Ed.2d 836] and *Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198 [84 Cal.Rptr.2d 496].

Under the law of the case doctrine, our earlier opinion in this case determines the law governing any retrial or appeal. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.) VCSS relies on the change of law exception to justify a departure from the doctrine. The doctrine does not apply where, in the interval between two appeals, the case law changed

because former decisions were overruled, or controlling authority established new precedent. (*Id.* at § 915, p. 951.)

But neither *Vermont* nor *Trinkle* overrules a former decision nor establishes new precedent by controlling authority. Neither case concerns, or even mentions, the California False Claims Act.

*Vermont* concerns whether a private individual can bring suit on behalf of the United States against a state under the federal False Claims Act (31 U.S.C. § 3729 et seq.). The court concluded that the state was not a "person" subject to liability under the federal act. Although the California act is derived from, and is similar to the federal act, they are not the same. Most significantly, the federal act, unlike the California act, does not define "person." Government Code section 12650, subdivision (b)(5), defines "person" as "any natural person, corporation, firm, association, organization, . . . business, or trust." In addition, the court's analysis of whether the state is a "person," within the meaning of the act, included such concepts as the "usual constitutional balance between States and the Federal Government," and whether such an action "would run afoul of the Eleventh Amendment . . . ." (*Vermont Agency of Natural Resources v. United States ex rel. Stevens, supra,* 529 U.S. at p. 787 [120 S.Ct. at pp. 1859-1860, 146 L.Ed.2d at p. 854].) These are not relevant considerations in construing the California act.

*Vermont* was influenced by a provision in the federal act allowing treble damages. (31 U.S.C. § 3729.) This provision if applied to the state would violate the federal policy against awarding punitive damages against a public entity. (*Vermont Agency of Natural Resources v. United States ex rel. Stevens, supra,* 529 U.S. at pp. 784-786 [120 S.Ct. at pp. 1868-1870].)

The California False Claims Act has a treble damages provision identical to the federal act (§ 12651) and a policy against awarding punitive damages against a public entity § 818).

This does not change the law of the case. ■ We are not bound by a federal court's interpretation of a federal act, even where both acts may contain some identical language. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 943, p. 984 ["Federal decisions are, of course, not controlling on matters of state law"].) Moreover, unlike *Vermont*, where the action was brought on behalf of the federal government, here LeVine brought his action on his own behalf under section 12650, subdivision (b)(1). ■ The treble damages provision of section 12651 applies only to liability to the state or a political subdivision. Treble damages are not an issue here.

In *Trinkle*, the court concluded that the California State Lottery was not subject to the Unfair Practices Act (Bus. & Prof. Code, § 17200 et seq.) In

our first opinion in this case, we discussed public entity immunity under the Unfair Practices Act and public entity liability under the False Claims Act. The discussion was based on the rule that governmental agencies are excluded from the general provisions of a statute only if their inclusion would result in an infringement upon sovereign powers. (*LeVine v. Weis, supra*, 68 Cal.App.4th at p. 765.) We distinguished our previous opinion in *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 209-211 [56 Cal.Rptr.2d 732], holding that a county's operation of a public hospital was not subject to the Unfair Practices Act. We stated: "A county may have the sovereign power to fulfill its duty to guard the public health free from regulations that govern ordinary business. But no governmental agency has the power, sovereign or otherwise, knowingly to present a false claim. The very notion is repugnant to how government should operate by and for the people. VCSS is subject to the False Claims Act." (*LeVine*, at p. 765.)

Finally, VCSS contends section 818 prevents the act from applying to it. Section 818 provides, in part: "Notwithstanding any other provision of law, a public entity is not liable for . . . damages imposed primarily for the sake of example and by way of punishing the defendant."

Section 12653, subdivision (c), provides, in part: "An employer who violates subdivision (b) shall be liable for all relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and, where appropriate, punitive damages."

VCSS argues that the phrase "shall be liable," as used in the subdivision, makes an award of double backpay mandatory. Assuming that to be so, it does not mean double recovery is punitive. Section 12653, subdivision (c), includes double backpay among those items "necessary to make the employee whole." Thus the statute treats double backpay as remedial. Punitive damages is stated separately, only to be awarded "where appropriate."

Moreover, "Damages which are punitive in nature, but not 'simply' or solely punitive in that they fulfill 'legitimate and fully justified compensatory functions,' have been held not to be punitive damages within the meaning of section 818 . . . ." (*People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 35 [127 Cal.Rptr. 122, 544 P.2d 1322], italics omitted.) Here, the double award of backpay serves a legitimate and fully justified compensatory function. It serves to more fully compensate the employee for the incalculable risk he takes when he threatens to disclose or discloses his employer's false claim.

VCSS provides no basis for departing from the law of the case as established in the prior appeal.

## III

VCSS contends that LeVine never threatened to reveal that any defendant made a false claim. VCSS's theory is that it did not make a false claim, at most, it did nothing more than make an internal misallocation of funds.

■ The False Claims Act must be construed broadly so as to give the widest possible coverage and effect to its prohibitions and remedies. (*Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 724 [36 Cal.Rptr.2d 665].) Plaintiff need not show that a false claim was actually made; he need only show that he had reasonably based suspicions of a false claim. (See *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1125 [279 Cal.Rptr. 453].)

■ "In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. [Citation.]" (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241 [71 Cal.Rptr.2d 399].)

■ Here the evidence shows LeVine was threatening to expose more than an internal misallocation of funds. The evidence shows LeVine threatened to inform the Department of Education and other authorities that VCSS was claiming ADA funds from the state, without providing the expected level of classroom staffing. That is sufficient to come within the broad purpose and scope of the False Claims Act. In fact, the Department of Finance determined that VCSS had no lawful basis for claiming ADA funds for students who were not under the immediate supervision and control of a certified teacher. That was essentially LeVine's complaint.

VCSS's reliance on *U.S. ex rel. Hopper v. Anton* (9th Cir. 1996) 91 F.3d 1261 is misplaced. There a special education teacher alleged that the school district violated state and federal law by conducting evaluations of special education students without a classroom teacher and by unreasonably prolonging the evaluation process. The teacher alleged that the school district retaliated against her for objecting to the violations. The teacher filed an action under the federal False Claims Act. She alleged the school district made a false claim in reporting the number of special education students to the California Department of Education while the district had failed to comply with the law. She also alleged that the district made a false claim

when it certified it " 'will meet all . . . requirements of state and federal law . . . .' " (*U.S. ex rel. Hopper v. Anton, supra,* 91 F.3d at p. 1265.) The court determined that there was no evidence the school district made a false claim. The school district did not make a false certification of a present fact and the school district's statements did not cause the United States to provide an improper benefit.

But here VCSS's certification of the ADA constituted an actual claim for money based on a representation of fact. In the view of the Department of Finance, at least, one of the facts being represented is that the students for whom ADA is claimed were under the immediate supervision of a certified teacher. That manifestly was not true for the Unit School's students. There was a reasonable basis for LeVine to believe VCSS had made false claims. To the extent *Hopper* may be read to the contrary, we decline to follow it.

VCSS argues the trial court erred in refusing to give proposed instructions regarding the definition of "claim." But VCSS's proposed defendant's special instruction No. D-9 concerns liability to the state or a political subdivision.[2] Because the state or political subdivision is not a plaintiff in this action the instruction is confusing at best.

Defendant's proposed special instruction No. D-10 provides, in part: " 'Claim' includes any request or demand for money, property, or services

---

[2]Defendant's proposed special instruction No. D-9 provides: "Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($10,000) for each false claim: [¶] (1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval. [¶] (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision. [¶] (3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision. [¶] (4) Had possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt. [¶] (5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used. [¶] (6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property. [¶] (7) Knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decease an obligation to pay or transmit money or property to the state or to any political subdivision. [¶] (8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the a claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim."

made to any employee, officer, or agent of the state or of any political subdivision . . . if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state . . . or by any political subdivision thereof . . . ."

It is difficult to see how such an instruction would have been of any help to VCSS. It gives no precise definition of "claim," but only states what that term "includes." The proposed instruction excludes nothing from the definition of "claim."

In any event, the term "false claim" employs ordinary English words. It has no technical meaning. No instruction defining the term was necessary.

## IV

VCSS contends that individual defendants cannot be held liable under the False Claims Act.

In an unpublished portion of our prior opinion in this case, we concluded that governmental immunity (§ 821.6) barred LeVine's nonstatutory causes of action for wrongful termination. Here, we consider the different question whether section 12653 imposes liability on anyone other than the employer. It appears to be a case of first impression.

Section 12653, subdivision (b), provides in part: "No employer shall . . . discriminate against, an employee . . . because of lawful acts done by the employee . . . in furthering a false claims action . . . ." Subdivision (c) states, in part: "An employer who violates subdivision (b) shall be liable for all relief necessary to make the employee whole . . . ."

By its terms section 12653, subdivision (c), imposes liability only on the employer. In contrast, subdivision (d)(2) precludes an employee who participates in presenting a false claim from recovering under the act, unless the employee had been coerced "by the employer or its management."

If the Legislature had intended to impose liability on individuals or entities other than the employer, it would have said so. Thus, for example, section 53298 prohibits retaliation against an employee of a local public agency who reports gross mismanagement or waste of public funds. Section 53298.5 imposes liability individually on "any local officer, manager, or supervisor" who violates section 53298 with malicious intent.

■ In *Reno v. Baird* (1998) 18 Cal.4th 640 [76 Cal.Rptr.2d 499, 957 P.2d 1333], our Supreme Court determined that the California Fair Employment and Housing Act, section 12900 et seq. (FEHA), imposed liability for unlawful discrimination only on the employer, and not on individuals acting

for the employer. The court pointed out that FEHA draws a distinction between harassment and discrimination. Section 12940, subdivision (j)(1), prohibits "an employer . . . or any other person" from harassing an employee. Subdivision (a), however, prohibits only "an employer" from engaging in improper discrimination. (*Reno*, at pp. 644-645.) The court determined that individual managers were not liable under FEHA in spite of language defining an "employer" to include "any person acting as an agent of an employer." (§ 12926, subd. (d); *Reno*, at p. 655.)

Although *Reno* considered a different statute and is based on policy considerations not necessarily relevant here, the case is still instructive. It shows that when the Legislature states that liability shall be on the employer, that should not, without more, be construed to include the employer's managers as individuals. Here, there is no language in the statute showing the Legislature intended individual managers to be liable.

LeVine argues that *Reno* is actually favorable to him. He characterizes VCSS's actions as harassment for which managers may be individually liable under FEHA. But the argument misses the point. FEHA expressly imposes liability for harassment on "an employer . . . or any other person." (§ 12940, subd. (j)(1).) The False Claims Act mentions only the employer and does not include "any other person" or similar language.

*Southern California Rapid Transit District v. Superior Court, supra,* 30 Cal.App.4th at page 726, is of no help to LeVine. There the court determined that governmental immunity did not apply to state employees who were sued under the False Claims Act. But the case did not consider whether employees had liability under the statute in the first instance. Moreover, the court reached its result simply by stating that the result should be the same as that in *Shoemaker v. Myers* (1992) 2 Cal.App.4th 1407 [4 Cal.Rptr.2d 203]. *Shoemaker,* however, concerned a different statute. The statute under consideration in *Shoemaker* expressly created liability in an "officer or employee" of the state. (*Id.* at p. 1419 [considering former § 19683].)

*Southern California Rapid Transit District*'s relevance to this case is not enhanced by a footnote reference in *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 986, footnote 7 [42 Cal.Rptr.2d 842, 897 P.2d 1320]; *id.,* at pp. 987-988. There, the court recognized that *Southern California Rapid Transit District* is based on *Shoemaker.* The court noted that the statute in *Shoemaker* expressly made "*all state officers and employees* personally accountable." (*Caldwell,* at pp. 986-987, fn. 7.) The court then stated, "Insofar as such whistle-blower statutes focus in particular on those who act to suppress or punish revelations of fraud, corruption, or illegality in government business, the core statutory objectives might well be obviated by a conclusion that cover-up efforts by a public official are eligible for immunity." (*Ibid.*)

But the statute under consideration here does not "focus in particular on those who act to suppress or punish . . . ." (*Caldwell v. Montoya, supra*, 10 Cal.4th at pp. 986-987, fn. 7.) It does not mention officers or employees as among those who might be liable. Instead, it imposes liability only on the employer.

The judgments against individual employees of VCSS must be reversed.

## V

■ Finally, VCSS contends the trial court abused its discretion in awarding attorney's fees without apportionment.

LeVine requested an award of $241,957 in attorney's fees. The request was based on 976.9 hours at $250 per hour. VCSS asked that LeVine be required to apportion his fees between his cause of action under the False Claims Act, for which fees are allowed, and other causes of action alleged in his fourth amended complaint. The trial court found the requested $241,975 to be "extremely reasonable" and awarded the full amount.

The judge who presided at trial is in the best position to determine the reasonableness of the fees. (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].) The exercise of the trial court's discretion in awarding fees will not be disturbed unless it is clearly wrong. (*Ibid.*) Where the issues are so interrelated that it is impossible to separate them into claims for which fees are and are not awardable, no apportionment need be made. (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 [94 Cal.Rptr.2d 448].)

Here all causes of action arose out of the same facts. The nonstatutory wrongful termination claims were dismissed on summary adjudication and the contract cause of action was dismissed for failure to prosecute. The trial court could reasonably conclude that the amount of fees accrued solely on causes of action other than the Fair Claims Act was insignificant in light of the highly favorable judgment and the extreme reasonableness of the fees requested. There was no abuse of discretion.

The judgment against the individual defendants, Weis, Dritz, Shakelford and Strayhorn, is reversed. In all other respects the judgment is affirmed. Costs on appeal are awarded to LeVine.

Yegan, J., and Coffee, J., concurred.

A petition for a rehearing was denied July 25, 2001, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 10, 2001.