[No. B217191. Second Dist., Div. Eight. Nov. 17, 2011.]

ADA CORDERO-SACKS, Plaintiff and Respondent, v.
HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Defendant
and Appellant.

COUNSEL

Burke, Williams & Sorensen, Charles E. Slyngstad, Sanaea H. Daruwalla; Morris Polich & Purdy and David L. Brandon for Defendant and Appellant.

Law Offices of Craig T. Byrnes, Craig T. Byrnes; The Feldman Law Firm, Lee R. Feldman and Gina Browne for Plaintiff and Respondent.

OPINION

**RUBIN, Acting P. J.**—The Housing Authority of the City of Los Angeles appeals from the judgment following a jury trial in favor of its former employee, Ada Cordero-Sacks. We affirm the judgment as modified.

## FACTS AND PROCEEDINGS

Applying the usual rules of appellate review, we state the evidence in the light most favorable to the judgment. (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 462–463 [120 Cal.Rptr.3d 797].) Appellant is the Housing Authority of the City of Los Angeles (the Authority). Respondent is Ada Cordero-Sacks, a licensed attorney hired in October 2006 to work in the Authority's Office of Internal Control. The Office of Internal Control investigates internal misconduct and fraud within the Authority.

For reasons not pertinent to this appeal, in 2007 the director of the Authority's technical services department, Victor Taracena, fell under suspicion that he was awarding contracts to unqualified corporations that he had secretly set up with family members. The contracts were for retrofitting public housing to bring the housing into compliance with accessibility laws for the disabled. In May 2007, Rudolf Montiel, who was the Authority's president and chief executive officer, authorized the Office of Internal Control (OIC) to investigate Taracena. OIC quickly discovered Taracena had steered over $800,000 in the Authority's contracts to corporations his family controlled.

During OIC's investigation of Taracena, information surfaced that may have suggested the Authority's president, Montiel, was involved in Taracena's fraud. One seemingly incriminating, but eventually debunked, link between

Montiel and Taracena was the fact that Montiel's brother was related by marriage to a man who shared the same last name—Valdiva—as Gustavo Valdiva, who was one of Taracena's accomplices. As part of OIC's investigation, Cordero-Sacks in August 2007 conducted an online search of Montiel's relative using the ChoicePoint commercial database. A key factual dispute in the case, which the jury resolved against appellant Authority, is whether Montiel authorized OIC to investigate him as part of the Taracena investigation; the jury implicitly found he did. Eventually, OIC established that the relative and Taracena's accomplice were different men.

About six weeks later, on October 9, 2007, the Authority fired Cordero-Sacks. At the time of her discharge, the Authority did not tell Cordero-Sacks why it was terminating her. Her notice of discharge merely stated she was "being separated" from her position. In February 2008, Cordero-Sacks filed her complaint for wrongful termination.[1] The complaint asserted that the Authority fired Cordero-Sacks because she had participated in investigating Taracena's misuse of the Authority's funds. The complaint alleged a cause of action for wrongful termination in violation of public policy. It also alleged a cause of action for violation of the statutory prohibition against retaliatory discharge in California's False Claims Act. (Gov. Code, § 12653.)[2] The retaliatory discharge provision of the False Claims Act states: "No employer shall discharge . . . an employee . . . because of lawful acts done by the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under" the False Claims Act. (§ 12653, subd. (b).)[3]

During pretrial discovery, the Authority stated it terminated Cordero-Sacks for three reasons. First, she conducted the ChoicePoint search of Gustavo Valdiva without Montiel's approval (a claim which we have noted the jury implicitly rejected). Second, she had been sanctioned $100 in August 2007 by the superior court in an Authority lawsuit she was overseeing when she missed a court deadline in the lawsuit, resulting in its dismissal. (The court

---

[1] The Authority had hired Cordero-Sacks in October 2006 as a probationary employee and she was still on probation when the Authority fired her in early October 2007. By not relying on Cordero-Sacks's probationary status to defend against her lawsuit, the Authority seemingly acknowledges that it may not fire her for an unlawful reason even if it could fire her without cause.

[2] All undesignated statutory references are to the Government Code.

[3] Cordero-Sacks also alleged a cause of action for violation of the Labor Code's protection for whistleblowers (Lab. Code, § 1102.5), which the trial court nonsuited when Cordero-Sacks conceded she could not prove the cause of action without violating the court's rulings on inadmissibility of her attorney-client communications with the Authority's personnel. Cordero-Sacks filed in the trial court a notice of cross-appeal apparently directed to the court's nonsuit of her cause of action, but has not filed an opening brief in the cross-appeal, thereby having abandoned the issue. (Cal. Rules of Court, rule 8.220.)

reinstated the lawsuit after Cordero-Sacks paid the sanction and filed a motion under Code Civ. Proc., § 473 admitting her negligence.) And third, she had not told the Los Angeles City Attorney's Office, which is the Authority's general counsel, about the $100 sanction.

The trial court granted in part and denied in part the Authority's motion for summary judgment and adjudication. The court granted summary adjudication of Cordero-Sacks's cause of action for wrongful termination in violation of public policy (a so-called *Tameny* claim (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330])) because that cause of action cannot lie against a public entity. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899 [80 Cal.Rptr.3d 690, 188 P.3d 629].) The court rejected, however, the Authority's assertion that Cordero-Sacks's duty to maintain the confidentiality of her attorney-client communications with Authority personnel made it impossible for her to prove the Authority unlawfully discharged her. Hence, Cordero-Sacks's single cause of action for retaliatory discharge under the False Claims Act was tried to a jury, which issued a special verdict in her favor. The thrust of the jury's findings was that Cordero-Sacks acted lawfully when she conducted the ChoicePoint searches in furtherance of a False Claims Act action, and the Authority would not have fired her but for those searches. The jury awarded Cordero-Sacks $98,889 in past economic damages, $330,000 in future economic losses, and $10,000 in past noneconomic losses.[4] This appeal followed.

## DISCUSSION

### 1. *Cordero-Sacks Sued the Authority for Retaliatory Discharge*

Cordero-Sacks sued the Authority under the False Claims Act. (§ 12650 et seq.) The False Claims Act prohibits a "person" from defrauding the government of money, property, or services by submitting to the government a "false or fraudulent claim" for payment. (§ 12651, subd. (a).) Section 12651 of the act allows for treble damages against a person who submits such a claim. (§ 12651, subd. (a).) The Authority contends we must reverse the judgment because, as a governmental entity, the Authority is not a "person" under the act, which defines a "person" as "any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust." (§ 12650, subd. (b)(8).) The definition does not include governmental agencies, a point affirmed by our Supreme Court in *Wells v.*

---

[4] The trial court awarded 10 percent postjudgment interest. The Authority asserts, and Cordero-Sacks agrees, the proper rate was 7 percent because the Authority is a public entity. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 345 [45 Cal.Rptr.2d 279, 902 P.2d 297]; *311 South Spring Street Co. v. Department of General Services* (2009) 178 Cal.App.4th 1009, 1013, fn. 1 [101 Cal.Rptr.3d 176].)

*One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192–1193 [48 Cal.Rptr.3d 108, 141 P.3d 225]. In a case involving a lawsuit against a school district that supposedly defrauded the State of California, *Wells* stated "governmental agencies . . . may not be sued under California's false claims statute." (*Wells*, at p. 1193; accord, *State of California ex rel. Dockstader v. Hamby* (2008) 162 Cal.App.4th 480, 484 [75 Cal.Rptr.3d 567] [may not circumvent bar against suing governmental agency for filing a false claim by suing the agency's employee because agency's duty to indemnify employee makes suit against employee tantamount to a suit against the agency].) The Authority is thus correct it is not a *person* from which Cordero-Sacks may recover money for the Authority's making a false claim; Cordero-Sacks's judgment rests, however, on the Authority's liability as an *employer* under the False Claims Act's prohibition against retaliatory discharge, a provision to which we now turn.

■ The False Claims Act bans retaliatory discharge in section 12653, which speaks not of a "person" being liable for defrauding the government, but of an "employer" who retaliates against an employee who assists in the investigation or pursuit of a false claim. Section 12653 has been "characterized as the whistleblower protection provision of the [False Claims Act and] is construed broadly." (*Kaye v. Board of Trustees of San Diego County Public Law Library* (2009) 179 Cal.App.4th 48, 59 [101 Cal.Rptr.3d 456].) The section states: "No employer shall discharge . . . an employee . . . because of lawful acts done by the employee on behalf of the employee or others . . . in furthering a false claims action, including investigation for, . . . or assistance in, an action filed or to be filed under [the False Claims Act]." (§ 12653, subd. (b).)

■ The Authority contends we should interpret the term "employer" in the retaliatory discharge provision as a subset of a "person" who can be liable for making a false claim, so that only employers who are "persons" can be liable for retaliatory discharge. The Authority's interpretation is unconvincing for several reasons. First, it violates the principle of statutory construction that different words used in the same statute mean different things. (*People v. Albillar* (2010) 51 Cal.4th 47, 56 [119 Cal.Rptr.3d 415, 244 P.3d 1062]; *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1071 [108 Cal.Rptr.3d 577].) ■ The Legislature presumably intended to target different malefactors when it used the word "person" in section 12651 allowing treble damages against a "person" who tries to defraud the government with a false claim, compared to its use of the word "employer" in section 12653 prohibiting retaliation against an employee. Because the injury the government suffers from a false claim differs from the injury an employee suffers from retaliatory discharge, it stands to reason that the party subject to liability—a "person" who defrauds the government versus an "employer" who retaliates against an employee—need not overlap.

Case law supports observing a distinction between "person" and "employer." In *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720 [60 Cal.Rptr.3d 375], the court's discussion of a city housing authority's ability to collect damages (coincidentally the very same Authority before us in this appeal) distinguished between a "person" under the damages provision and an "employer" under the retaliatory discharge provision because they involved different sections of the False Claims Act. (*Fassberg*, at pp. 737–738.) And it is instructive that federal courts applying the federal False Claims Act (12 Stat. 696), which is analogous to California's False Claims Act, also distinguish between a "person" and an "employer." (*Fassberg*, at p. 735 ["The California False Claims Act is patterned after the federal False Claims Act . . . so authorities applying the federal act may be persuasive to the extent the language of the two acts is similar." (citation omitted)].) In *U.S. ex rel. Satalich v. City of Los Angeles* (C.D.Cal. 2001) 160 F.Supp.2d 1092 (*Satalich*), the district court found that even though a city was not a "person" which could be liable under federal law for submitting a false claim, the city was an "employer" potentially liable for retaliatory discharge.[5] And in *Wilkins v. St. Louis Housing Authority* (8th Cir. 2002) 314 F.3d 927, the court of appeals adopted *Satalich*'s reasoning and held that even though a public housing authority was not a person subject to false claims liability, it could be an employer liable for retaliation. (*Wilkins*, at pp. 931–932.)

In support of affixing the meaning of "person" to the definition of "employer," the Authority notes that *Wells v. One2One Learning Foundation* disapproved a related pair of cases which had held a governmental agency was a person under the False Claims Act. (*LeVine v. Weis* (1998) 68 Cal.App.4th 758 [80 Cal.Rptr.2d 439] (*LeVine I*) and *LeVine v. Weis* (2001) 90 Cal.App.4th 201 [108 Cal.Rptr.2d 562] (*LeVine II*), disapproved in *Wells v. One2One Learning Foundation, supra*, 39 Cal.4th at p. 1197.) In the *LeVine* cases, a governmental agency argued liability for retaliatory discharge attached only if the False Claims Act protected the employee's conduct in reporting a false claim. (*LeVine I, supra*, 68 Cal.App.4th at p. 764; *LeVine II*,

---

[5] *Satalich* analyzed a since amended version of the federal False Claims Act. The version which *Satalich* discussed codified a distinction between recovery against any "person" for filing a false claim versus recovery for retaliation by "any employer." (Compare 31 U.S.C. § 3729(a)(1) ["any person" in connection with false claim] with 31 U.S.C. former § 3730(h) [liability for "employer" who retaliates against employee in connection with false claim].) In 2009, Congress amended the retaliation provision to omit the reference to "any employer." It now reads: " 'Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of other efforts to stop 1 or more violations of this subchapter.' " (Pub.L. No. 111-21, § 4(d) (May 20, 2009) 123 Stat. 1617.)

*supra*, 90 Cal.App.4th at p. 210.) In disapproving *LeVine I* and *LeVine II*, the *Wells* court held a governmental agency was not a person. *Wells* stated: "[W]e conclude the Legislature did not intend to subject financially constrained [governmental agencies] to the treble-damages-plus-penalties provisions of the [False Claims Act]. We conclude that such entities are not 'persons' subject to suit under that statute. We disapprove [the two decisions in *LeVine v. Weis*] to the extent they hold otherwise." (*Wells*, at pp. 1196–1197.) *Wells* did not discuss whether a governmental agency was an "employer" subject to liability for retaliatory discharge. It therefore offers the Authority little help.

█ The Authority also argues the retaliatory discharge provision did not apply because Cordero-Sacks did not conduct her ChoicePoint searches to investigate or pursue a qui tam action. The Authority contends the False Claims Act protected Cordero-Sacks from retaliation only if Cordero-Sacks were acting for herself or another as a potential or actual qui tam plaintiff when she conducted the ChoicePoint searches. Instead, according to the Authority, Cordero-Sacks was by her own description properly discharging her normal job duties—ferreting out fraud—when she conducted the searches. Thus, the Authority concludes, the False Claims Act did not apply. The Authority is mistaken because the act's retaliation provision applies not only to qui tam actions but to false claims in general. Section 12653 makes it unlawful for an employer to retaliate against an employee who is engaged "in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under Section 12652." (*Id.*, subd. (b).) Section 12652 permits the Attorney General on behalf of the State of California, the local prosecuting authority on behalf of a state political subdivision, and private parties as qui tam plaintiffs, to sue defendants who submit false claims to the state or a political subdivision. Our Supreme Court's decision in *State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220 [48 Cal.Rptr.3d 144, 141 P.3d 256], describes the statutory division of labor into which a qui tam action falls: "The [False Claims Act] specifies in detail who may bring and prosecute actions under that statute, depending on whether state or political subdivision funds are involved. If state funds are involved, the Attorney General may bring the action. [Citation.] *If political subdivision funds are involved, the action may be brought by the political subdivision's 'prosecuting authority' [Citation], i.e., 'the county counsel, city attorney, or other local government official charged with investigating, filing, and conducting civil legal proceedings on behalf of, or in the name of, [the] particular political subdivision'. . . . [¶] . . .* [¶] There is, however, a third category of eligible plaintiffs under the [False Claims Act]. A 'person' with independent knowledge of the facts, who gets to the courthouse first, may bring a qui tam action for and in the name of the state (if state funds are involved), or a political subdivision (where the

political subdivision's funds are involved), or both." (*Harris*, at pp. 1227–1228, italics added & omitted, citation omitted.)

█ Under the foregoing division of labor, Cordero-Sacks need not have been pursuing a qui tam action when she conducted the ChoicePoint searches. The italicized language demonstrates it was sufficient that she was investigating Victor Taracena for what might have been *the Authority's* false claims action.[6] (Accord, *Kaye v. Board of Trustees of San Diego County Public Law Library, supra*, 179 Cal.App.4th at p. 60 ["Generally, to constitute protected activity under the [False Claims Act], the employee's conduct must be in furtherance of a false claims action. [Citation.] The employee does not have to file a false claims action or show a false claim was actually made; however . . . it must be reasonably possible for the employee's conduct to lead to a false claims action."].)[7]

In the same vein of Cordero-Sacks's retaliation claim purportedly not being grounded in a viable qui tam action, the Authority asserts Cordero-Sacks conducted her ChoicePoint searches after the Authority had referred Taracena's case to the Los Angeles County District Attorney for possible prosecution. According to the Authority, once it referred the matter in June 2007 to the district attorney, no further justification existed for Cordero-Sacks to continue her investigation. Furthermore, according to the Authority, the False Claims Act provides that a governmental agency employee such as Cordero-Sacks may pursue a false claims action only if the employee exhausts the agency's chain of command for reporting and investigating false claims and the agency fails to act on the reported information. The Authority cites section 12652, subdivision (d)(4), which states: "No court shall have jurisdiction over an action *brought under subdivision (c)* based upon information discovered by a present or former employee of the state or a political subdivision during the course of his or her employment unless that employee first, in good faith, exhausted existing internal procedures for reporting and seeking recovery of the falsely claimed sums through official channels and unless the state or

---

[6] The record does not suggest that Cordero-Sacks ever considered a qui tam action, a lawsuit that *Wells v. One2One Learning Foundation, supra*, 39 Cal.4th at page 1193, would have barred.

[7] Federal law is in accord. (*Satalich, supra*, 160 F.Supp.2d at p. 1108 ["Since a municipality is immune from liability [for filing a false claim], the City claims that Plaintiff's investigation into the City's alleged fraud cannot constitute a lawful act in furtherance of an action under the [federal False Claims Act] . . . . [¶] Retaliation claims . . . are not dependent on a relator's ability to succeed on, or even file, a cause of action under section 3729. [Citations.] Thus, the fact that Plaintiff's [False Claims Act] claim against the City ultimately proved unsuccessful does not, in and of itself, bar Plaintiff from proceeding on a . . . retaliation claim against the City." (citations omitted)]; see *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson* (2005) 545 U.S. 409, 416, fn. 1 [162 L.Ed.2d 390, 125 S.Ct. 2444] [under federal False Claims Act, proving a false claim for payment is not an element of a cause of action for retaliation].)

political subdivision failed to act on the information provided within a reasonable period of time." (Italics added.) The Authority's referral of Taracena to the district attorney shows that the Authority did not fail to act on its information that Taracena had submitted false claims to the Authority. But the Authority's reliance on the requirement that the Authority have ignored information about Taracena's false claims is nevertheless unavailing because that requirement by its own terms applies only to subdivision (c) which governs the pursuit of a false claims action by a qui tam plaintiff—"No court shall have jurisdiction over an action brought *under subdivision (c)* . . . ." (§ 12652, subd. (d)(4), italics added; see § 12652, subd. (c)(1) ["A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff."].) As we have observed, Cordero-Sacks was not a qui tam plaintiff, and the requirement that the agency have ignored information about the false claims does not refer to the section prohibiting retaliatory discharge under which Cordero-Sacks sued, section 12653.

## 2. *Nondisclosure of Attorney-client Confidences*

The Authority notes that an in-house attorney such as Cordero-Sacks ordinarily may not pursue a retaliatory discharge claim against her former employer if doing so divulges attorney-client confidences. (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1169 [32 Cal.Rptr.2d 1, 876 P.2d 487] (*General Dynamics*); *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 457–458 [107 Cal.Rptr.2d 456]; see 84 Ops.Cal.Atty.Gen. 71 (2001) [attorney's duty of confidentiality supersedes whistleblower protection for attorney]; Evid. Code, § 954.) The gravamen of Cordero-Sacks's claim is that the Authority fired her for her ChoicePoint searches for Gustavo Valdiva, who shared the last name of a man related by marriage to the brother of the Authority's president, Rudolf Montiel. The Authority contends Cordero-Sacks tried to prove retaliatory discharge by wrongfully disclosing at trial confidential information that she had acquired as an in-house attorney in the Authority's OIC. The Authority does not, however, identify the confidences Cordero-Sacks purportedly disclosed. Moreover, the trial court had granted the Authority's pretrial motion in limine to exclude from evidence attorney-client communications among Cordero-Sacks, Authority personnel, and the Los Angeles City Attorney's Office. The Authority pays little heed to the court's consistent enforcement of its order excluding attorney-client communications during Cordero-Sacks's testimony, when the Authority successfully objected about a dozen times to questions that sought to invade the attorney-client privilege. As the trial court later noted, it "sustained every single objection that was made." The court reminded counsel that "I believe I

sustained every single objection that [the Authority] made. [¶] [Cordero-Sacks counsel]: Every one. [¶] [Court]: Every single one. . . . There were a couple there where the witness blurted out something that had been restricted by motion in limine, but the minute they were halfway through it, there was an objection, I sustained it. So then I believe I instructed the jury to disregard it."

The Authority's contention is at bottom an argument about sufficiency of the evidence. Take away the confidential information, the Authority contends, and Cordero-Sacks's retaliatory discharge claim fails for lack of proof. The logic of the Authority's contention compels the Authority, as the party challenging the court's judgment, to identify the errors the court made in receiving inadmissible evidence, and to parse the supposedly erroneously admitted confidential information from the properly admitted nonconfidential information in order to demonstrate how the nonconfidential information is insufficient to support the judgment. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1278–1279 [48 Cal.Rptr.3d 715].) The Authority does not attempt that demonstration. Indeed, the Authority indirectly concedes it has not done so in its reply brief, where it states, "Although [Cordero-Sacks] argues that she made out her Government Code section 12653 claim [for retaliatory discharge] without privileged information, the Court will never know if that is true because of the undisciplined manner in which she approached trial and presented her case before the jury." In fact, the reason this court "will never know" is that the Authority, as the appellant challenging the court's judgment, does not identify the nonconfidential evidence stripped of confidential information and show how the nonconfidential information was insufficient. The Authority's failure to satisfy its obligation results in its contention's failure.

The Authority alternatively contends we must reverse the judgment because the trial court did not insist Cordero-Sacks make a pretrial offer of proof showing she could prove retaliatory discharge using only nonconfidential information. In support, the Authority reads *General Dynamics* to require the trial court "to determine in the first instance whether some statute or ethical rule specifically permitted Cordero-Sacks" to divulge attorney-client confidences as she pursued her claim against the Authority. According to the Authority, a pretrial proceeding outside the jury's presence would have had the salutary effect of saving the Authority from needing to object in front of the jury to protect attorney-client confidences. The Authority reasons that forcing it repeatedly to object in the jury's presence as if the Authority were trying to hide something, in a case involving alleged concealment of wrong-doing and whistle-blowing, risked tainting the Authority in jurors' eyes.

■ The Authority's reliance on *General Dynamics* to compel the trial court to put Cordero-Sacks to the test of a pretrial offer of proof falls short, however, because *General Dynamics* reviewed a demurrer sustained without

leave to amend. In its discussion, *General Dynamics* noted that eventually during the course of the lawsuit an attorney claiming wrongful discharge must show she can prove her case without divulging attorney-client confidences, or show that confidentiality has been waived. (*General Dynamics, supra,* 7 Cal.4th at pp. 1190–1191.) *General Dynamics* did not, however, describe any particular procedure the trial court must employ in putting the attorney to that showing, and the Authority cites no published decisions describing any such procedure. In the absence of such authority, the trial court's resort to the procedures employed here to protect the Authority's privileged information—granting the Authority's motion in limine and sustaining the Authority's trial objections—was sufficient to ensure the jury decided the case based on nonconfidential information, and thus was not error. We see no reason to create a special offer of proof procedure only in retaliatory discharge cases that might involve attorney-client confidential information. (See *General Dynamics, supra,* at p. 1191 ["[T]rial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege. The use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings, are but some of a number of measures that might usefully be explored . . . ."].)

### 3. *Evidence of Job Performance*

During discovery, the Authority identified three reasons why it terminated Cordero-Sacks: her purportedly unauthorized ChoicePoint searches; her $100 trial court sanction; and her failure to tell the city attorney's office about the sanction. When Cordero-Sacks inquired during discovery about the Authority's discussions with the city attorney's office about her job performance in working with city attorneys, the Authority exercised its right to withhold that information on the grounds of attorney-client privilege. The Authority's opening brief plainly states the Authority's invocation of the privilege. The brief states: "Because these inquiries by Cordero-Sacks directly sought evidence of privileged communications between the assistant city attorneys and their client [(the Housing Authority)], the Housing Authority asserted privilege to prevent disclosure of what the agency's employees had been told by [the city attorney]." Based on the Authority's assertion of the attorney-client privilege, the trial court granted Cordero-Sacks's evidentiary motion barring the Authority from offering evidence that the Authority had withheld from discovery on the basis of the attorney-client privilege.

Despite the court's ruling, the Authority tried during trial to offer evidence that the reason it fired Cordero-Sacks was the city attorney's unhappiness

with Cordero-Sacks's job performance. The Authority first tried to offer the evidence through one of the Authority's managers, who testified one reason the Authority fired Cordero-Sacks was she "didn't get along with the city attorney office." The court sustained Cordero-Sacks's objection to that testimony as hearsay. The Authority then tried to offer evidence of the city attorney's dissatisfaction through the testimony of Cordero-Sacks's main contact with the city attorney's office, assistant city attorney Michael Custodio. The court excluded his testimony on the matter, however, because the Authority had prevented Cordero-Sacks from learning what the city attorney's office had told the Authority's decision makers about her job performance.

The Authority contends the trial court's exclusion of evidence from the city attorney's office about Cordero-Sacks's job performance was error because it prevented the Authority from showing it fired Cordero-Sacks for poor job performance. We review the trial court's exclusion of evidence for abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558 [113 Cal.Rptr.3d 458, 236 P.3d 312]; *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 602–603 [63 Cal.Rptr.3d 165].) Here, as the Authority concedes, the Authority asserted the attorney-client privilege during discovery, resulting in Cordero-Sacks not being able to learn what the city attorney's office had told the Authority about her job performance. The court ruled that the Authority's successful invocation of the attorney-client privilege barred the Authority from using at trial evidence it had successfully withheld from discovery. The city attorney was not the decision maker in discharging Cordero-Sacks; the Authority's managers were the decision makers. The city attorney's assessment of Cordero-Sacks's job performance was relevant only to the extent the city attorney communicated that assessment to the Authority. Because the Authority did not allow discovery of those communications, the court did not abuse its discretion in excluding those communications at trial.

### 4. Mitigation of Damages Instructions

The jury found by its special verdict that the Authority did not prove that the steps Cordero-Sacks took to mitigate her damages after she lost her job were unreasonable. After her discharge, Cordero-Sacks applied for at least one government attorney job but did not get the position. She thereafter started her own law practice. By the time of trial, her practice was at best only moderately successful. She testified, "It's not going very good. When I got fired I didn't have any clients, but I have some clients now, and I've been making some money. . . . I have money coming in, but I also have money going out. . . . A lot of it's going out and expenses."

The Authority contends the court misinstructed the jury about Cordero-Sacks's duty to mitigate her damages. Our Supreme Court's articulation of a discharged employee's duty to mitigate her damages, which we rely on to guide our analysis of the Authority's contention, is as follows: "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. [Citations.] However, before projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181–182 [89 Cal.Rptr. 737, 474 P.2d 689], fn. omitted.)

The court instructed the jury with several form instructions. One instruction explained that Cordero-Sacks had a duty to take work substantially similar to her position at the Authority, but the Authority had the burden of proving such work existed. (See CACI No. 2407.) Two other instructions emphasized that the jury must reduce its award for Cordero-Sacks's past and future economic damages by the amount she could have earned if she had taken substantially similar available employment. (See CACI Nos. 3961, 3962.) The instruction explaining her duty to take substantially similar work stated: "The Housing Authority of the City of Los Angeles claims that if Ada Cordero-Sacks is entitled to any damages, they should be reduced by the amount that she could have earned from other employment. To succeed, the Housing Authority of the City of Los Angeles must prove all of the following: [¶] That employment substantially similar to Ada Cordero-Sacks's former job was available to her; [¶] That Ada Cordero-Sacks failed to make reasonable efforts to seek this employment; and [¶] The amount that Ada Cordero-Sacks could have earned from this employment. In deciding whether the employment was substantially similar, you should consider, among other factors, whether: [¶] The nature of the work was different from Ada Cordero-Sacks's employment with the Housing Authority of the City of Los Angeles; [¶] The new position was substantially inferior to Ada Cordero-Sacks's former position; [¶] The salary, benefits, and hours of the job were similar to Ada Cordero-Sacks's former job; [¶] The new position required similar skills, background, and experience; and [¶] The job responsibilities were similar." (CACI No. 2407.)

Additionally, Cordero-Sacks submitted the following instruction, which the court gave to the jury: "The employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in

order to mitigate damages. [¶] Substantially equivalent employment affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the position from which Ms. Cordero-Sacks has been terminated." The Authority does not indicate that it objected to that instruction.

For its part, the Authority offered the following instruction about Cordero-Sacks's duty to mitigate damages from her loss of employment and her decision to open her own practice: "In determining whether Ada Cordero-Sacks mitigated her damages by starting her own business, you must first determine whether Ms. Cordero-Sacks's self-employment was a reasonable alternative to finding other comparable employment. Self-employment may not be reasonable where an employee could have obtained comparable employment but instead chose to become self-employed and as a result receive little or no income. [¶] Additionally, an employee's decision to become self-employed must remain reasonable for the entire time period. Therefore, if the business is unprofitable, you may decide that Ms. Cordero-Sacks should have resumed her search for other comparable employment in order to fulfill her obligation to mitigate her damages. [¶] If you find that Ms. Cordero-Sacks's decision to start her own business was unreasonable or that the decision to remain self-employed despite the business's lack of profit was unreasonable, then you should find that Ms. Cordero-Sacks failed to mitigate her damages and that the Housing Authority is relieved of any obligation to pay for Ms. Cordero-Sacks's lost earnings. [¶] If you find that Ms. Cordero-Sacks's decision to start her own business was reasonable and that her decision to remain self-employed despite the business's lack of profit was reasonable, you should reduce the amount of the backpay award for lost earnings by the business's profits, or, if none, by the reasonable value of Ms. Cordero-Sacks's services, including the future value of the business."

The trial court refused the Authority's proposed instruction.

The Authority contends the court's error was twofold. First, the court erred in instructing with Cordero-Sacks's instruction because it misstated the law. According to the Authority, a replacement job need not be, as Cordero-Sacks urged, "virtually identical" to trigger a discharged employee's obligation to take the job under her duty to mitigate her damages. Second, the court's rejection of the Authority's instruction permitted the jury to conclude Cordero-Sacks acted reasonably in persisting with her own law practice even though it generated little income.

We review jury instructions as a whole. (*Cumbre, Inc. v. State Comp. Ins. Fund* (2010) 189 Cal.App.4th 1381, 1388 [117 Cal.Rptr.3d 582].) We conclude that the court's instructions on Cordero-Sacks's duty to mitigate her

damages, when taken as a whole, adequately informed the jury of Cordero-Sacks's obligation to mitigate her damages. First, the Authority did not object to Cordero-Sacks's instruction, thus failing to preserve its point for appeal. Second, the Authority's instruction, which the court refused, was infirm because it risked confusing the jury by telling jurors that they must first address the question of whether Cordero-Sacks's decision to open her own practice was reasonable: "In determining whether Ada Cordero-Sacks mitigated her damages by starting her own business, you must first determine whether Ms. Cordero-Sacks's self-employment was a reasonable alternative to finding other comparable employment." In fact, because mitigation is an affirmative defense, it was the Authority's burden to show that other employment opportunities were available to Cordero-Sacks. (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 409 [122 Cal.Rptr.3d 53] ["As the Supreme Court has explained, the burden to prove failure to mitigate damages lies squarely with the employer . . . ."].) In the absence of suitable replacement employment, Cordero-Sacks's pursuit of her own practice was not unreasonable even if it generated little income.

The Authority's citation to *Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.* (5th Cir. 1989) 865 F.2d 1461 in support of its instruction is unavailing. The Authority cites it for the proposition that remaining self-employed is unreasonable when self-employment is unprofitable. There, the discharged employee's replacement work was self-employment selling items at a weekend flea market, which generated little income. *Hansard* did not, as the Authority suggests, hold that pursuing an unsuccessful business is unreasonable; rather, *Hansard* found that the discharged employee's efforts at making his weekend work a viable business were insufficient. The *Hansard* court explained: "A plaintiff's decision to become self-employed, alone, does not indicate a lack of reasonable diligence. [Citations.] That is not the case here. In this case Hansard's efforts were simply insufficient. The flea market business was never more than a part-time enterprise. Hansard was fully capable of continuing his job search during the week. Further, Hansard did not approach the flea market as a business, rather he primarily gathered odds and ends from his home and sold them." (*Id.* at p. 1468.) After setting the foregoing context, the *Hansard* court then stated the following, which the Authority cites to support its position: "In addition, once Hansard found the business unsuccessful, his duty to mitigate damages required him to resume his search for other employment." (*Ibid.*) Viewing the sentence the Authority quotes within the context of the *Hansard* court's criticism of Hansard's lack of diligence, we conclude the Authority reads too much into *Hansard* when the Authority asserts that pursuing unprofitable self-employment is necessarily unreasonable.

Indeed, a sister federal court of appeals noted in discussing *Hansard* that self-employment is not unreasonable mitigation as long as the discharged

employee applies sufficient effort trying to make the business successful, even if those efforts fail. In *Smith v. Great American Restaurants, Inc.* (7th Cir. 1992) 969 F.2d 430, the court of appeals explained: "The cases indicate that self-employment, if reasonable, counts as permissible mitigation, and the jury could certainly conclude that [the employee's] efforts were reasonable. In fact, [the employer's] own witness conceded that [the employee's] opening of a restaurant was a reasonable venture. [The employer's] reliance on *Hansard v. Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461 (5th Cir.), *cert. denied*, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989), is misplaced. In *Hansard*, the court explicitly recognized the general principle that self-employment can satisfy the burden of diligence in mitigation, but found the plaintiff's burden not satisfied by his flea market enterprise . . . . Here, in contrast, it is uncontested that [the employee's] efforts in opening and operating [a restaurant] were serious and in fact much *greater* than required by an ordinary full-time job. A jury could rationally determine that [the employee's] self-employment was a reasonable, good faith exercise of diligence. The notion that starting one's own business cannot constitute comparable employment for mitigation purposes not only lacks support in the cases, but has a distinctly un-American ring." (*Id.* at p. 438, italics added.)

### 5. *Attorney's Fee Award to Cordero-Sacks*

Cordero-Sacks requested $830,377.50 in statutory attorney's fees. (§ 12653, subd. (c).) Her fee request consisted of a lodestar amount of $415,188.75 in actual fees increased by a multiplier of two. She derived the lodestar amount from the 702.1 hours worked by Attorney Craig Byrnes at the rate of $450 an hour and the 251.25 hours worked by Attorney Gina Browne at $395 an hour. The Authority opposed the fee request, arguing the rates and hours were excessive for the results achieved. The court awarded Cordero-Sacks the full lodestar amount without a multiplier.

The Authority contends the fee award ought to be reduced by at least 50 percent because Cordero-Sacks prevailed on only one of two causes of action that went to trial. We find the Authority's description of Cordero-Sacks's success at trial as being only one out of two as unduly contrived. Cordero-Sacks's causes of action were interrelated, each alleging wrongful termination connected to Cordero-Sacks's investigation of fraud in the Authority. Her cause of action for violation of Labor Code section 1102.5 alleged her discharge violated that statute's protection of whistleblowers. Her common law cause of action for wrongful discharge alleged her termination violated public policy. And her cause of action for violation of section 12653, upon which she prevailed, alleged the Authority fired her in retaliation for her investigation. "Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or

substantially all of the plaintiff's fees even if the court did not adopt each contention raised." (*Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 997 [242 Cal.Rptr. 272]; see *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431 [69 Cal.Rptr.3d 1] [same].) "When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 [94 Cal.Rptr.2d 448].) The Authority has not identified any work by Cordero-Sacks's attorneys that was chargeable only to her unsuccessful causes of action. We conclude the court did not abuse its discretion in awarding Cordero-Sacks the lodestar amount for her attorney's fees even though she prevailed at trial on only one cause of action. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 [39 Cal.Rptr.3d 788, 129 P.3d 1] [attorney's fee award reviewed for abuse of discretion]; *Kim v. Euromotors West/The Auto Gallery* (2007) 149 Cal.App.4th 170, 175–176 [56 Cal.Rptr.3d 780].)

 The Authority also contends Attorney Byrnes's $450 hourly rate was excessive, and asks that we reduce it. The trial court is in the best position to determine the reasonableness of the hourly rate of an attorney appearing before the court and the value of the attorney's professional services. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].) " 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) In support of reducing Byrnes's hourly rate, the Authority cites a survey of hourly rates compiled by the United States Attorney's Office for the District of Columbia and a survey of statewide average rates in California. As these surveys did not focus on Los Angeles County, where this litigation arose and this case was tried, they are of little, if any relevance, and in any case cannot supplant the trial court's expertise. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735] ["the lodestar is the basic fee for comparable legal services in the community . . ."]; *PLCM Group, supra,* at

p. 1096 [trial court did not err in calculating award based on "prevailing market rate for comparable legal services in San Francisco, where counsel is located"].)

## DISPOSITION

The judgment is amended to award respondent Ada Cordero-Sacks 7 percent postjudgment interest, and, as amended, the judgment is affirmed. Respondent is awarded her costs on appeal.

Flier, J., and Grimes, J., concurred.

A petition for a rehearing was denied December 15, 2011, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 22, 2012, S198990.