[No. E048799. Fourth Dist., Div. Two. Nov. 9, 2010.]

CUMBRE, INC., et al., Plaintiffs and Appellants, v.
STATE COMPENSATION INSURANCE FUND, Defendant and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of parts 1., 3., 4., 5., and 6.

COUNSEL

Nossaman, James C. Powers, K. Erik Friess and David J. Farkas for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Andre J. Cronthall, Whitney Jones Roy and Alison N. Kleaver for Defendant and Respondent.

OPINION

RAMIREZ, P. J.—Cumbre, Inc., and Coachella Valley Insurance Service, Inc. (Cumbre), acted as preferred brokers for the State Compensation Insurance Fund (SCIF) until 2003, when the Department of Insurance pressured SCIF to terminate unprofitable brokers. Because Cumbre's loss ratio was consistently over 80 percent over a three-year period, its contract was terminated. Although SCIF gave brokers an opportunity to appeal the decision, Cumbre was unsuccessful in securing reinstatement because it would have had to exclude a substantial portion of its book of business to bring its loss ratio down to 80 percent. Cumbre sued for damages under several theories. In 2005, the trial court sustained a demurrer to the breach of contract cause of action without leave to amend, and granted SCIF's motion for summary judgment as to the common law cause of action for violation of fair procedure, and the cause of action for unfair competition.

In a prior opinion, we affirmed the trial court's order sustaining the demurrer, but reversed the summary judgment on the ground that there was a triable issue of fact. (*Cumbre, Inc. v. State Comp. Ins. Fund* (May 14, 2007, E040219) [nonpub. opn.].) On remand, the matter went to trial and a jury returned verdicts in favor of SCIF on all causes of action. Cumbre now appeals that judgment.

## BACKGROUND

Cumbre, including its wholly owned subsidiary Coachella Valley Insurance Service, Inc., is an insurance brokerage focusing on workers' compensation insurance. SCIF is a public enterprise fund and a state agency under the Department of Industrial Relations. (Ins. Code, § 11773; Lab. Code, § 56.) SCIF provides employers with workers' compensation insurance, operating as a self-supporting business. (Ins. Code, § 11775.) SCIF was required to provide a market for employers that needed workers' compensation insurance. SCIF was a direct writer of insurance for most of its existence, but

began working with brokers in 1993. In 1995, Cumbre applied for and obtained certification to submit business as a broker for SCIF.

Brokerage contracts with SCIF were one-year agreements, with commissions paid monthly. The standard contract, in effect in 2003, included provisions permitting SCIF to modify commissions in its discretion and providing that the contract would remain in effect until December 31, 2003, unless revised, suspended or terminated before that date. The agreement further set out the commissions to be paid and provided it was terminable by either party after not less than 60 days' prior written notice, among other things. Brokers, like Cumbre, whose premium volume met certain criteria, were also eligible for override commissions, as "preferred brokers," based on volume, retention, and quality.

Between 1999 and 2003, there was significant increase in loss costs for workers' compensation benefits affecting all carriers that wrote insurance in California, causing many insurers to go bankrupt or be liquidated. This had an adverse impact on SCIF's financial condition, because, as the insurer of last resort, it was required by law to provide insurance to any employer requesting workers' compensation insurance.

Because the amount of business written between 2000 and 2002 grew more than the amount of surplus available to pay claims, SCIF was deemed to have reached "regulatory action level," requiring SCIF to submit a risk-based capital plan to the Department of Insurance to reduce the amount of business it wrote and to increase the surplus. In 2002, officers of SCIF met with the Department of Insurance to discuss various ways to reduce the loss ratios, which were below industry levels. Among several other components of the risk-based capital plan, SCIF was urged to terminate agents producing unprofitable business. Unprofitability was determined to mean that the broker exceeded an 80 percent loss ratio for the preceding three-year period. "Loss ratio" refers to the difference between the amount incurred to cover losses in claims compared with the amount of premium earned. The criteria for the broker termination program also included a $175,000 stop loss per claim and the accumulated account size had to be greater than $500,000 for the three-year period of 1999, 2000, and 2001.

Between 2002 and 2003, SCIF's financial problems got worse. By December 2002, SCIF had reached the mandatory control level according to the Department of Insurance guidelines. This level is the most severe level, at which the Department of Insurance has authority to take control over a company and replace management. In January 2003, SCIF was informed by

the Insurance Commissioner that SCIF needed to continue to work on its inadequate capital position and was asked to take action to improve its financial position and develop a plan to address those issues. SCIF drafted the risk-based capital plan the following month, to increase capital through additional retained earnings, increasing premium rates and reducing commissions to brokers. The Department of Insurance now required SCIF to escalate the broker termination program, and made further demands.

After reviewing broker records for the preceding three-year period, it was determined that Cumbre met the unprofitable broker criteria, and, in April 2003, SCIF notified Cumbre that its brokerage agreement would be terminated, effective in August 2003. The notice informed Cumbre that it could appeal the termination and seek reinstatement. Cumbre did so, pointing out to SCIF that the calculation of the loss ratio failed to include some policies that met the criteria, included policies that should have been excluded, as well as accounts that were no longer clients.

Using revised criteria, Cumbre argued its loss ratio was just under 80 percent. Unfortunately, to reach Cumbre's calculation, a substantial percentage of its book of business would have to be disregarded (approximately 20 percent), and even so, Cumbre's loss ratio was consistently higher than most other brokers. Additionally, the loss ratio was only one of five criteria that compelled Cumbre's termination under the program, where other brokers only had two or three factors working against them. Even after correcting the loss ratio to account for a math error, bringing the loss ratio down to 79.55 percent, SCIF's opinion about the profitability of Cumbre was unchanged. To ensure fairness, SCIF reviewed Cumbre's appeal twice.

Cumbre's appeal was therefore unsuccessful. Notwithstanding the broker termination program, SCIF continued to pay commissions for the book of business Cumbre brought in even after August 2003, and permitted Cumbre to submit policy renewals to SCIF. Cumbre claimed it lost $300,000 for its 2003 preferred broker commissions, and its business valuation expert estimated that Cumbre lost $18,652,835 as a result of the loss of its workers' compensation business, $28,017,204 for the loss of other lines of business, for total lost profits of $46,670,039.[1]

The defense experts disputed this estimate, pointing out that the brokerage contract gave SCIF the right to terminate at any time upon 60 days' notice, so

---

[1] The reporter's transcript indicates a sum of $46,670.39, but this appears to be a typographical error.

any damage estimate was based on a speculative assumption. It also ignored the effect of Insurance Code section 769, which provides policyholders with continued coverage and representation by a broker, allowing Cumbre to continue to place its clients' business with SCIF for up to a year after termination.

Further, SCIF's expert noted that two-thirds of Cumbre's damage claim related to lines of business other than workers' compensation insurance. Cumbre's long-term damage estimates did not take into account the fluctuations of the stock market, or the fact that Cumbre could place its workers' compensation business with other carriers, maintaining its broker relationships with employers, and erroneously assumed that some employers would remain insured by SCIF indefinitely, where the actual analysis showed that out of 388 policies, 136 would be lost for nonpayment of premiums, cancellation for noncompliance with policy terms, or other reasons having nothing to do with the broker termination program. And, contrary to Cumbre's assertion that it was damaged, its income increased from $3.5 million in 2001, to $4.2 million after the termination of the brokerage contract.

In July 2003, Cumbre filed a complaint seeking injunctive relief and damages arising from the termination of its brokerage agreement with SCIF. In March 2004, SCIF offered reinstatement to all terminated brokers, effective in 2004. The offer of reinstatement provided that brokerages engaged in litigation arising out of the broker termination program were ineligible for reinstatement. Because Cumbre had instituted legal action, it did not seek reinstatement.

The fifth amended complaint was filed in 2005. It alleged causes of action for violation of the duty of fair procedure, interference with prospective economic advantage, and unfair competition (Bus. & Prof. Code, § 17200 et seq.).[2] On December 15, 2005, upon cross-motions for summary adjudication and summary judgment, the trial court issued a statement of decision denying Cumbre's motion and granting SCIF's motion for summary judgment. This judgment was appealed in *Cumbre, Inc. v. State Comp. Ins. Fund, supra,* E040219, where we affirmed the orders sustaining the demurrers but reversed the summary judgment on the ground there were triable issues of fact.

Following the remittitur, the matter proceeded to trial by jury on the remaining causes of action. On March 6, 2009, the jury returned special verdicts finding (1) the termination of Cumbre's broker status had a significant effect on its substantial economic interest; (2) SCIF's creation of the

---

[2] Causes of action for breach of contract and violation of civil rights (42 U.S.C. § 1983) were dismissed by way of an order sustaining demurrers to those claims, which were affirmed in a prior appeal in this matter. (*Cumbre, Inc. v. State Comp. Ins. Fund, supra,* E040219.)

broker termination program was substantively rational; (3) SCIF's decision to terminate Cumbre's broker status was substantively rational; and (4) SCIF provided Cumbre with adequate notice of the reasons for termination of its broker status and a reasonable opportunity to respond. Judgment in favor of SCIF was filed on June 5, 2009, from which Cumbre appeals.

## DISCUSSION

1. *There Is Substantial Evidence to Support the Judgment on the Common Law Claim for Violation of Fair Procedure.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *The Jury Instructions and Special Verdict Form Pertaining to the Claim for Violation of Fair Procedure Were Correct.*

Cumbre argues that the jury instructions and the special verdict form did not correctly state the law as to procedural fairness. We disagree.

■ We begin by noting that there are no published decisions discussing the propriety of instructions in actions for violation of fair procedure, and there are no pattern jury instructions. None of the published decisions addressing the common law right to fair procedure discuss the issue of whether a party claiming a violation of that right is entitled to a jury trial. We observe that review of fair procedure violations in the medical peer review context is limited to review by way of extraordinary writ petition. (Bus. & Prof. Code, § 809.8.) Writ review has been utilized in other situations where an organization acts as a "gatekeeper" over the right to practice a lawful trade or profession. (See *Dougherty v. Haag* (2008) 165 Cal.App.4th 315, 318 [81 Cal.Rptr.3d 1].) This may be because the logical remedy for an unfair procedure or hearing is a new and fair hearing, or an injunction prohibiting the gatekeeper from enforcing the penalty or exclusion. (See *Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 164 [81 Cal.Rptr. 623, 460 P.2d 495].)

a. *Reviewing Standards*

■ Assuming there is a right to a jury trial in an action for damages for violation of the right of fair hearing, we apply settled rules governing review. A party is entitled to have the jury instructed as to its theory of the case provided (1) that it requests and submits legally correct instructions, and (2) that there is sufficient evidence to support the theory. (*Thompson Pacific*

---

[*]See footnote, *ante,* page 1381.

*Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 547 [66 Cal.Rptr.3d 175].) When it is argued that a jury has been erroneously instructed, we examine all the circumstances of the case including a review of all the evidence, as well as the instructions as a whole. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].) We review the court's alleged error in instructing the jury de novo. (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 164 [100 Cal.Rptr.3d 219].) The standard of review for a special verdict is also de novo. (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 707 [99 Cal.Rptr.3d 418].)

### b. *Discussion*

██ As Cumbre correctly points out, the doctrine of fair procedure has two requirements or elements: (1) the decisionmaking process must be substantively rational; and (2) the decisionmaking must be procedurally fair. (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1072 [95 Cal.Rptr.2d 496, 997 P.2d 1153].) The instructions given by the court, while worded slightly differently from Cumbre's requested instruction, correctly instructed the jury on those elements.

The instruction on fair procedure requested by Cumbre stated: "Cumbre claims that SCIF owed a duty to afford it fair procedure in connection with its termination of Cumbre's broker arrangements and that SCIF breached that duty. [¶] When the doctrine of fair procedure applies, the insurer's decision making must be both substantively rational and procedurally fair. [¶] The duty of fair procedure applies where an insurer provides services affecting the public interest; has superior bargaining power; and makes a decision that infringes on a substantial economic interest. [¶] To establish that SCIF had a duty to afford plaintiffs fair procedure, Cumbre must prove by a preponderance of the evidence that SCIF's termination of its broker relationships with Cumbre had a significant effect on Cumbre's substantial economic interest. [¶] Fair procedure does not require any specific procedure that must always be followed. It does not require formal proceedings with all the embellishments of a court trial, nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. However, the process used must be procedurally fair, and the decision made must be substantively rational. [¶] . . . [¶]"

The instruction read to the jury stated: "Cumbre contends that State Fund owed Cumbre a duty of fair procedure. In order to establish that State Fund owed Cumbre a duty of fair procedure, Cumbre must prove that the termination of Cumbre's broker status had a significant effect on Cumbre's substantial economic interest. [¶] If you determine that State Fund did owe Cumbre a

duty of fair procedure when it terminated Cumbre's broker status, you must next consider whether State Fund fulfilled its duty. In order to demonstrate that State Fund did not satisfy the duty of fair procedure, Cumbre must prove: [¶] 1. That State Fund's creation of its broker termination program was not substantively rational, or [¶] 2. That State Fund failed to provide Cumbre with adequate notice of the reasons for termination and a reasonable opportunity to respond. [¶] A decision is substantively rational when it is not arbitrary, discriminatory, or otherwise without any rational basis at the time the decision was made. [¶] To meet its duty of fair procedure, should you find such a duty applies, SCIF must have provided Cumbre with notice of the reasons for SCIF's decision and an opportunity to be heard. [¶] The opportunity to be heard does not require an in-person hearing, nor must it include an independent decision-maker, or any of the formalities of a full-blown judicial proceeding. [¶] It is for you to determine whether SCIF provided such fair procedure to Cumbre."

Cumbre complains that (1) the instruction did not mention a duty to be fair; (2) "notice of the reasons for SCIF's decision" is not a sufficient statement of the duty to give notice of the charges against Cumbre; and (3) an "opportunity to be heard" is not a sufficient statement of the requirement that Cumbre have a reasonable opportunity to respond to the charges against it. The language of the instruction speaks for itself and covers the elements Cumbre claims are missing.

█ The instruction given specifically instructed the jury on the first element, that if SCIF owed a duty of fair procedure, Cumbre must establish the elements of fair procedure; that it was not substantively rational, or that it failed to provide adequate notice of the reasons for termination and opportunity to respond. SCIF must have provided Cumbre with both notice of the reasons for the decision *and* an opportunity to be heard. The opportunity to be heard necessarily includes the opportunity to respond, since one cannot be heard unless one responds.

As to the special verdict form, we conclude it correctly addressed the issues the jury had to decide. Absent any authority to the contrary, we conclude there was no error in the instructions or special verdict.

3.–6.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1381.

## DISPOSITION

The judgment is affirmed. SCIF is entitled to costs on appeal.

McKinster, J., and Richli, J., concurred.

A petition for a rehearing was denied December 2, 2010, and appellants' petition for review by the Supreme Court was denied January 12, 2011, S188872. Cantil-Sakauye, C. J., did not participate therein.