Filed 6/22/26  P. v. Valle CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

|  |  |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>$379,744 IN UNITED STATES CURRENCY,<br>        Defendant;<br><br>CHRISTIAN VALLE et al.<br>        Defendants and Appellants. | C104122<br><br>(Super. Ct. No. STK-CV-UA-F-2020-0006241) |

Claimants and appellants Christian Valle, Yessina Vaca, and Jesus Vaca appeal from a judgment forfeiting all but $829 of $379,744 in United States currency seized as connected to the illegal sale of narcotics.[1]  Claimants contend on appeal the judgment as to Jesus must be reversed because special verdicts returned by the jury were irreconcilably inconsistent.  We agree and will reverse the judgment as to Jesus only and remand for a new trial.

_____

[1] Due to their shared surname, we will refer to Yessina Vaca and Jesus Vaca by their first names.

1

## FACTS AND PROCEEDINGS

### I.    Forfeiture Petition and Opposition

On June 10, 2020, law enforcement seized $379,744 in United States currency (seized currency) during a search of a residence on Progress Way in Stockton.  Two days later, the People filed criminal complaints against Valle and Yessina (who lived in the searched residence), alleging possession of controlled substances for sale.  On June 22, the People notified Valle and Yessina, as well as non-claimant Rita Arcos (Arcos), of nonjudicial forfeiture proceedings regarding the seized currency.  On July 23, claimants jointly filed a verified claim asserting a lawful interest in the seized currency and requesting that it not be forfeited.

On September 17, the People filed a petition seeking forfeiture of the seized currency.  (Health & Saf. Code, § 11469 et seq.)[2]  The petition alleged that the seized currency was subject to forfeiture because it was furnished or intended to be furnished in exchange for a controlled substance, traceable to such an exchange, or used or intended to be used to facilitate narcotics trafficking.  (§ 11470, subd. (f).)

The parties agreed to a stay of discovery in the forfeiture action pending resolution of the related criminal proceedings.  Following resolution of the criminal proceedings, the forfeiture action proceeded to a jury trial.

### II.    Trial Evidence of the Seizure and Narcotics Activity

In November 2018, a law enforcement officer conducted a traffic stop of an SUV driven by Yessina.  During a consent search of the SUV, the officer found a backpack containing a large amount of United States currency in mixed denominations, bundled in stacks with rubber bands, and sealed in plastic bags.  The officer did not find any controlled substances in the SUV and did not know the source of the currency.

---

[2]  Further undesignated statutory references are to the Health and Safety Code.

2

On June 10, 2020, law enforcement officers executed a search warrant at Yessina's and Valle's residence on Progress Way, and at Jesus's (Yessina's father) residence on Searchlight Avenue, both in Stockton. During the search of the Progress Way residence, officers found $379,744 in mixed denominations in various containers and rooms, including $829 in a mason jar found in a children's bedroom, and money counting machines. Additional evidence of narcotics sales was found in the residence, including pills possibly containing fentanyl, a digital scale, a vacuum sealer with compatible bags, latex gloves, and sandwich bags. An officer testified at trial that he believed the seized currency constituted proceeds from illegal narcotics sales and would be used in future narcotics transactions, although he could not connect any of the seized currency to any particular narcotics transaction.

During the search of the Searchlight Avenue residence, officers found eight firearms in Jesus's bedroom, including two AR-15-style rifles, an SKS rifle, an AK-47-style pistol, a .45-caliber pistol, two .38-caliber revolvers, and a .380-caliber pistol, and magazines and ammunition. Approximately $5,000 in mixed United States and Mexican currency was found but not seized.

Jesus was interviewed at the time of the search with the assistance of a Spanish interpreter, although the interviewing officer observed as the interview progressed that Jesus was responding in English, and appeared to understand and speak English. Jesus asserted that two of the revolvers found in the search belonged to family members who had left them at his house, and that his son owned three guns, but he denied knowledge of the remaining firearms. Jesus said his daughters and Valle lived at the Progress Way residence but that he rarely went there, and the only possession he kept there was a car. The interviewing officer asked him, "So, if there was like four million dollars over there, that- that's not yours? There's no money over there that belongs to you?" Jesus responded, "No, no money. No."

3

More than one year later, on July 22, 2021, another search warrant was executed at a self-storage unit rented to Arcos, who also lived at the Progress Way residence. The self-storage unit contained a bag with 222.4 grams of a substance appearing to be methamphetamine, three bags with 1,021.4, 105.6, and 0.1 grams of a substance appearing to be heroin, cellophane wrapping commonly used as packaging for narcotics, and a digital scale. At trial, an officer opined that both substances were possessed for sale.

On that same date, officers searched the Progress Way residence. A key to the self-storage unit was found in the residence. Arcos subsequently produced a second key to the self-storage unit and sought to take "full responsibility" for the substances found inside. A money counting machine and luxury consumer goods were also in the residence, and a bag containing approximately one pound of marijuana was found in an SUV registered to Yessina that was parked in front of the residence.

### III. Evidence of Jesus's Innocent Ownership of the Seized Currency

Valle and Yessina testified that $100,000 of the seized currency belonged to Valle. Yessina added that $20,000 of the seized currency was hers, she was holding about $4,000 for Arcos from her tax return, the $829 in the mason jar was her 10-year-old son's savings and birthday gifts from his family, and the remainder belonged to Jesus. Both Valle and Yessina acknowledged that they had responded to the People's interrogatories that all the currency belonged to them.

Jesus testified that approximately $250,000 to $280,000 of the seized currency belonged to him. He earned money by growing agave in Mexico and selling it to major tequila manufacturers, and he also installed air conditioning for a construction company.[3]

---

[3] Jesus added that he owned a check-cashing business for a period of time, and in the course of running that business he used the money counting machine that was found during the 2020 search of the Progress Way residence.

He maintained a modest balance in a bank account in Mexico and approximately $30,000 in an American bank account but kept most of his assets in cash. Jesus stated he brought approximately $400,000 to Yessina's house on Progress Way because he frequently traveled to Mexico, and his house on Searchlight Avenue was small and in an unsafe neighborhood. He then gifted $40,000 to his children and would periodically "bring some and take some." Finally, Jesus testified that he did not suspect or believe that the money he left at Yessina's house was or would be used in narcotics transactions.

Jesus also testified about his statement to law enforcement that he kept no money at Yessina's house. He recalled that he understood some, but not all, of what the interviewing officer said to him in English during the interview, and he had difficulty speaking English. He recalled being asked whether he had $4 million at Yessina's house, to which he responded that he did not, and he confirmed that, had he been asked how much money he kept at Yessina's house, he would have reported $260,000 to $280,000.

## IV. Verdicts and Judgment

On February 14, 2025, the jury returned completed verdict forms as to each claimant. The verdict form as to Jesus, which we discuss in greater detail later, included three questions. The first question asked: "Does the jury find that Jesus Vaca has an ownership interest in the seized $379,744?" The jury answered, "Yes." The second question asked: "Do you find that any of the seized $379,744 funds related to Jesus Vaca are innocent funds or that he did not have knowledge or did have consent to the illegal use of his funds?"[4] The jury answered, "Yes" to that question as well. The third

---

[4] It appears the clerk misspoke when reading the question answered by the jury. The verdict form read: "Do you find that any of the seized $379,744.00 funds related to Jesus Vaca are innocent funds or that he did not have knowledge or *did not consent* to the illegal use of his funds?" (Italics added.)

5

question asked:  "What amount, if any, of the $379,744 should be returned to Jesus Vaca?"  The jury answered, "Zero dollars."

As to Yessina, the jury found that some amount of the seized currency was innocent, or she did not have knowledge of or consent to the illegal use of the funds, and determined that $829 should be returned to her.[5]  As to Valle, the jury found that none of the seized funds were innocent funds, or that he lacked knowledge of or did not consent to the illegal use of the funds.

On March 10, the trial court entered judgment forfeiting all but $829 of the seized currency.  The court then denied several posttrial motions filed by claimants, including motions for new trial, additur, and judgment notwithstanding the verdict.  Jesus argued in part that a partial new trial or judgment notwithstanding the verdict was required because the verdict was against the law and irreconcilable.  Specifically, Jesus contended that once the jury found that he had an ownership interest in the seized currency, and that some portion of those funds were either innocent, or that he did not have knowledge of or consent to the illegal use of the funds, the jury was required to return $260,000 to him pursuant to section 11488.5.[6]

In opposition, the People argued in part that the verdict should be upheld because it was supported by substantial evidence.  The People also took the position that the verdict could be reconciled because the jury necessarily found some portion of the $829 returned to Yessina's son to be a gift of innocent money from Jesus.

---

[5]  As we stated earlier, there was evidence that $829 of the seized currency was found in a mason jar belonging to Yessina's minor son.

[6]  Section 11488.5, subdivisions (d) and (e) require the return of claimed funds where the claimant has an ownership interest in the funds, and where the government has not proved by clear and convincing evidence that the claimant knew that the seized funds would be used for a purpose for which forfeiture is permitted and consented to that use.

As to Jesus's challenge to the verdict form, the trial court ruled: "The record will reflect that all jury instructions and verdict forms were discussed with counsel in open court and agreed upon by counsel without objection."

Claimants timely filed a notice of appeal.

## DISCUSSION

Claimants contend reversal is required as to Jesus because the jury's verdicts were irreconcilably inconsistent. According to claimants, the jury's finding that none of the seized currency should be released to Jesus irreconcilably conflicted with its findings that Jesus had an ownership interest in the seized currency that was at least partially innocent or lacking knowledge of or consent to the illegal use of the currency. Disagreeing, the People argue that the jury's findings were reconcilable because the jury could have found some portion of the seized currency to be innocent funds merely "related to" Jesus, but not owned by him, and therefore Jesus was not entitled to return of currency he did not own. We conclude the verdicts were irreconcilably inconsistent requiring reversal of the judgment and remand for retrial as to Jesus only.

### I.    Forfeiture Proceedings

"A forfeiture proceeding is a civil in rem action in which property is considered the defendant, on the fiction that the property is the guilty party. [Citations.] Statutes imposing forfeitures are disfavored and are to be ' "strictly construed in favor of the persons against whom they are sought to be imposed." ' " (*People v. Superior Court (Plascencia)* (2002) 103 Cal.App.4th 409, 418 (*Plascencia*); accord *Ramirez v. Tulare County District Attorney's Office* (2017) 9 Cal.App.5th 911, 917.)

Under California's drug asset forfeiture laws (§ 11469 et seq.), property connected with certain unlawful drug activity may be forfeited to the state or local government. (*Ramirez v. Tulare County District Attorney's Office*, *supra*, 9 Cal.App.5th at p. 917.) "[C]urrency is subject to forfeiture if it is furnished or intended to be furnished in exchange for a controlled substance, traceable to such an exchange, or used or intended to

7

be used to facilitate trafficking in, or the manufacture of, various controlled substances." (*Plascencia*, *supra*, 103 Cal.App.4th at p. 419, citing § 11470, subd. (f).)

When a governmental agency files a petition of forfeiture in the superior court (§ 11488.4), a claimant is entitled to a jury trial at which the provisions of the Code of Civil Procedure generally apply. (*Plascencia*, *supra*, 103 Cal.App.4th at p. 419, citing § 11488.5, subds. (a), (c)(2) & (3).) "A claimant in a civil forfeiture proceeding ' "must show he [or she] has a recognizable legal or equitable interest in the seized property" in order to establish standing.' " (*Plascencia*, at p. 420.) Once standing has been established, to obtain forfeiture of $40,000 or more in currency, as here, the government must prove by clear and convincing evidence that "the owner of any interest in the seized property consented to the use of the property with knowledge that it would be or was used for a purpose for which forfeiture is permitted." (§§ 11488.5, subd. (d)(1), 11488.4, subd. (i)(4).) "If the court or jury finds that the seized property was used for a purpose for which forfeiture is permitted, but does not find that a person claiming an interest therein, to which the court has determined he or she is entitled, had actual knowledge that the seized property would be or was used for a purpose for which forfeiture is permitted and consented to that use, the court shall order the seized property released to the claimant." (Former § 11488.5, subd. (e).)

## II. Verdict Forms Background

The parties disagree about how to properly characterize the verdict returned by the jury, which, as we will explain, affects our standard of review. Accordingly, we begin with an overview of the types of verdicts and the standard of review for claims of inconsistent verdicts applicable to each.

"The verdict of a jury is either general or special." (Code Civ. Proc., § 624.) "The distinction between a general and special verdict is that under the former a jury 'pronounce[s] generally upon all or any of the issues,' while the latter is one 'by which the jury find the facts only, leaving the judgment to the court.' " (*Textron Financial*

8

*Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1073, quoting Code Civ. Proc., § 624, disapproved on other grounds by *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 382.) While a special verdict requires the jury to determine every controverted fact issue, a general verdict implies findings in favor of the prevailing party. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242.)

In addition to general and special verdicts, a jury may be called upon to return a general verdict with special findings or interrogatories, in which the jury returns a general verdict and answers specific questions of fact. (Code Civ. Proc., § 625.) The purpose of such special findings is to determine " ' "whether the general verdict is or is not against law." ' " (*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303.)

" 'Inconsistent verdicts are " 'against the law' " ' and are grounds for a new trial." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 (*Horton*).) Our standard of review of a claim of inconsistent verdicts depends on the type of verdict returned. (*Id.* at p. 678.) Where special findings of fact conflict with a general verdict, the special findings control the general verdict. (Code Civ. Proc., § 625.) However, " ' "the general verdict will stand unless the facts found by the jury in answer to special interrogatories are so clearly antagonistic to it as to be absolutely irreconcilable, the conflict being such as to be beyond the possibility of being removed by any evidence admissible under the issues, so that both the general verdict and special findings cannot stand." ' " (*Curtis v. State of California ex rel. Dept. of Transportation* (1982) 128 Cal.App.3d 668, 689.)

The rule of reconciliation between inconsistent special findings and a general verdict does not apply to inconsistencies between special verdicts. (*Horton*, *supra*, 126 Cal.App.4th at p. 679.) A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1048.) "A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special

9

verdict when the inconsistency is between two questions in a special verdict." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.) On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. (*Cumbre, Inc. v. State Comp. Ins. Fund* (2010) 189 Cal.App.4th 1381, 1388.)

Where there are inconsistencies between or among answers within a special verdict or irreconcilable findings, "both or all the questions are equally against the law," and a reviewing court is not permitted to choose between inconsistent answers. (*Horton, supra*, 126 Cal.App.4th at p. 682.) In the circumstance of an inconsistent special verdict, the proper remedy is to order a new trial. (*Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630, 655.)

### III.  Additional Procedural Background

On February 10, 2025, during trial but outside the jury's presence, the parties and the trial court discussed the verdict forms. As to Jesus, the court indicated that the verdict form should be drafted to require the jury to answer three questions in sequential order. First, the jury was to determine whether Jesus had any ownership interest in the seized currency, which the court noted was a "threshold question of standing." The court then stated as to the second question: "I think we should ask on the special verdict form, 'Do you find that any of the seized funds are innocent funds? If yes, answer Question Number 3.' " "And then whatever remains after subtracting innocent funds must be deemed forfeitable by operation of law because [the jury] find[s] the remaining funds are not innocent funds by their verdict, by their special verdict." The court subsequently clarified that if the jury responded to the second question that any of the seized currency was "innocent," then the third question should require the jury to determine "[h]ow much, you know, the amount."

Claimants' counsel argued that the issue was not whether the seized currency was innocent, but rather whether Jesus knew the currency was connected to narcotics transactions, and therefore the verdict form should ask the jury to determine whether

Jesus knew the funds were or could be used in connection with the sale of controlled substances. The People agreed that the seized currency would be subject to forfeiture if the currency were innocent, but Jesus knew it was connected with narcotics transactions. The court agreed that the second question of the verdict form should ask whether Jesus knew the seized currency was connected to narcotics transactions. The parties agreed to submit written verdict forms the following morning.

Claimants' counsel submitted a proposed verdict form that included six questions: (1) "Does Claimant Jesus Vaca have an ownership interest in the $379,744?"; (2) "How much of the $379,744 belongs to Claimant Jesus Vaca?"; (3) "Do you find that Claimant Jesus Vaca's funds are subject to forfeiture as funds linked to the sale of controlled substance(s)?"; (4) "Did Claimant Jesus Vaca consent to the use of his funds with knowledge that it would be used in connection with the sale of a controlled substance?"; (5) "Do you find that innocent funds belonging to Claimant Jesus Vaca are comingled with tainted funds?"; and (6) "What amount of funds belonging to Claimant Jesus Vaca do you find are directly traceable to an exchange for a controlled substance?"

On February 11, again outside the jury's presence, the trial court rejected claimants' proposed verdict form as to Jesus on the basis that it did not comply with the law of forfeiture, was too lengthy, and would "giv[e] rise to some confusion among the jurors." The court reiterated that the verdict form should ask whether Jesus had an ownership interest in the seized currency, and if so, whether "the funds are innocent funds or he had no knowledge or consent."

The verdict form provided to the jury asked three questions related to Jesus. First, question No. 1 asked: "Does the jury find Jesus Vaca has an ownership interest in the seized $379,744.00?" If the jury found he did, the verdict form instructed the jury to answer question No. 2, which asked: "Do you find that any of the seized $379,744.00 funds related to Jesus Vaca are innocent funds or that he did not have knowledge or did not consent to the illegal use of his funds?" If yes, the verdict form instructed the jury to

11

answer question No. 3, which asked: "What amount, if any, of the $379,744.00 should be returned to Jesus Vaca?"

The trial court explained to the jury the verdict form relating to Jesus, as follows: "Question Number 1, does the jury find Jesus Vaca has an ownership interest in the seized money? And then you would check -- the foreperson would check yes or no.… 'If the jury finds Jesus Vaca has an ownership interest in the funds, then answer Question 2. If you find that Jesus Vaca has no ownership interest in the funds, then answer no further questions as to Jesus Vaca and have the presiding juror sign and date this form.' So you would be completed then with the issues regarding Jesus Vaca if you find no ownership interest.

"Question -- but if you do find he had an ownership interest, you would go to Question 2. 'Do you find that any of the seized funds related to Jesus Vaca are innocent funds or that he did not have knowledge or did not consent to the illegal use of his funds?' Do you so find? If yes, you have instructions. If no, you have instructions. If some or all the funds related to Jesus Vaca are innocent funds or you find that he had no knowledge or did not consent to the illegal use of the funds, then answer Question 3.' If your answer to Question 2 is no -- 'If no, answer no further questions and have the presiding juror sign and date the form.' Do you see the instructions? They follow on 'yes' or 'no,' depending on your response.

"Question 3, this is if you find he has an ownership interest and an innocent interest. Three, 'What amount, if any, of the funds should be returned?' Okay. That could be from zero to the entire amount. Okay, ladies and gentlemen? So that's how it would read."

As to Yessina and Valle, the jury was asked to determine: (1) whether any funds related to that claimant were innocent or the claimant lacked knowledge or did not consent to the illegal use, and, if so, (2) "[w]hat amount, if any of the funds should be returned?"

12

*IV. Analysis*

We turn first to the nature of the verdict form. The People argue that question No. 3 of the verdict form was a "who wins" general verdict because it authorized the jury to return an answer of "$0," while questions Nos. 1 and 2 were special verdicts because they asked the jury to make specific factual findings. Claimants disagree and argue that the three-question verdict form required the jury to return special verdicts. We agree with claimants.

Initially, if the jury had answered either of the first two questions on the verdict form in the negative, the jury would not have answered question No. 3, which is unlike a general verdict form with special interrogatories that requires the jury to return both the general verdict and the special interrogatories. (Code Civ. Proc, § 625; see *Mendoza v. Club Car, Inc.*, *supra*, 81 Cal.App.4th at p. 303 [purpose of special findings is to determine whether the general verdict is against the law].)

Next, contrary to how the People frame question No. 3, that question did not broadly ask the jury to provide the ultimate legal result of the action by finding in favor of either Jesus or the People. (See *Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at p. 1242.) Rather, question No. 3 directed the jury, after it found that Jesus had an ownership interest in the seized currency (question No. 1) and that his ownership interest in the seized currency was at least in part innocent or that he lacked knowledge of or consent to the illegal use of the currency (question No. 2), to quantify that interest. While it is true that an answer of "$0" to question No. 3 was a de facto verdict in favor of the People, question No. 3 sought (and the jury provided) a factual finding based on the evidence provided in the case.

The trial court's instructions to the jury and comments to the parties support this conclusion. The court instructed the jury with CACI No. 5012, "Introduction to Special Verdict Form," which, as the name implies, is given when a special verdict form is used: "I will give you verdict forms with questions you must answer. I have already instructed

13

you on the law you are to use in answering you [*sic*] these questions …. You must consider each question separately…. [Y]ou must answer the questions on the verdict forms in the order they appear. After you answer a question, … the form tells you what to do next." Conversely, the court did *not* instruct the jury with CACI No. 5022, "Introduction to General Verdict Form," which would have instructed: "I will give you [a] general verdict form[s]. The form[s] ask[s] you to find either in favor of [name of plaintiff] or [name of defendant] … I have already instructed you on the law that you are to refer to in making your determination[s]." (CACI No. 5022.)

Further, when discussing the verdict forms with the parties, the trial court indicated that question No. 3 was intended to be a factual finding, not a general verdict. The court clarified that question No. 3 would require the jury to provide "[h]ow much, you know, the amount" of Jesus's innocent interest in the seized currency, should it answer the verdict form's first two questions in the affirmative. Finally, while not dispositive on its own, the court repeatedly referred to the "special verdict form" when discussing the verdict forms with the parties. The People do not point us to anything in the record suggesting that the court or the parties intended for question No. 3 to be a general verdict.

Having decided the verdicts were special verdicts, we now review de novo whether the verdicts were irreconcilably inconsistent. (*Cumbre, Inc. v. State Comp. Ins. Fund*, *supra*, 189 Cal.App.4th at p. 1388.) We conclude they were.

As we have already said, section 11488.5, subdivisions (d) and (e) require the trial court to return seized funds in which a claimant has an ownership interest if the government failed to prove by clear and convincing evidence that the claimant consented to the use of property with knowledge that it would be or was used for a purpose where forfeiture is permitted. Here, the jury found that Jesus had an ownership interest in the seized currency, and it responded "yes" to the question whether "any of the seized $379,744.00 funds related to Jesus Vaca are innocent funds or that he did not have

14

knowledge or did not consent to the illegal use of his funds." Having found that Jesus had an ownership interest in the seized currency, and that his interest was at least partially innocent or that he lacked knowledge of or consent to the illegal purpose of the currency, the jury was legally required to answer question No. 3 in an amount greater than zero dollars. (See § 11488.5, subds. (d) & (e).) As a result, the jury's findings in response to question Nos. 1 and 2 cannot be reconciled with its finding in response to question No. 3.

The People disagree with this conclusion and argue that the jury's verdicts are not irreconcilably inconsistent. In support, they argue that question No. 2 could have been answered in two alternative ways, and the verdicts were reconcilable provided the jury answered question No. 2 in one of the alternative ways they propose. Specifically, the People argue the jury could have answered question No. 2 affirmatively if it found either: (1) some amount of the seized currency was innocent money that was merely " 'related to' " Jesus, which they define as "somehow connected to him," but not owned by him; *or* (2) Jesus "did not have knowledge or did not consent to the illegal use of" currency he owned. According to the People, if the jury found that Jesus gave innocent money to Yessina's son as a gift for his birthday, that money would be "related to" Jesus, allowing the jury to answer question No. 2 in the affirmative, but he would not have been entitled to the return of that money because, at the time the currency was seized, he had relinquished his ownership interest in it.

The People's argument is unpersuasive. First, their proposed interpretation of question No. 2 is not a natural reading of the question, which provided: "Do you find that any of the seized $379,744.00 funds related to Jesus Vaca are innocent funds or that he did not have knowledge or did not consent to the illegal use of his funds?" question No. 2 is most naturally read to begin by referring to "the seized $379,744.00 funds related to Jesus Vaca," and asking whether that single referent included either: (1) innocent funds, or (2) funds that were subject to forfeiture, but Jesus did not know of or consent to the use that subjected the funds to forfeiture.

15

Second, the People's interpretation of question No. 2 does not naturally follow from the structure of the verdict form. Question No. 1 asked the jury to determine whether Jesus had an ownership interest in the seized funds, and therefore standing to claim the funds. (See *Plascencia*, *supra*, 103 Cal.App.4th at p. 420.) The jury was instructed that it must answer question No. 2 only if it answered "yes" to question No. 1. Because the verdict form was intended to determine whether, and in what amount, Jesus was entitled to return of the seized currency, there would be no reason to ask the jury in question No. 2 to make a finding about currency that Jesus lacked standing to claim. Instead, the verdict form can only be reasonably interpreted as first asking the jury to determine whether Jesus had an ownership interest in the seized currency, second to determine whether the People had met their burden of proof under section 11488.5, subdivision (d), and third, if the People had not satisfied their burden, to quantify the amount of the currency Jesus was entitled to have returned.

The People argue that the jury was required to find the seized currency "related to" Jesus in order to return $829 to Yessina, presumably for her son.[7] There is nothing to support this argument, and there was no evidence that any of the money in Yessina's son's mason jar was a gift from Jesus, as opposed to gifts from unnamed family members.

Finally, the record does not suggest that the trial court or the parties intended for question No. 2 to be interpreted as the People now suggest. In discussing the verdict form with the parties, the court described the structure of the verdict form: "[Q]uestion

---

[7] The People also argue that the jury could have determined $829 should be returned to Yessina for her son only on the basis that the $829 was "related to" her because Yessina did not testify that she owned the $829, and therefore the jury could not have found that she had an ownership interest in the $829. The judgment as to Yessina is not before us in this appeal, and accordingly we do not address the jury's verdict as to her. In any event, no claimant was entitled to the return of seized currency that the claimant lacked standing to claim.

16

one:  Does the jury find Jesus Vaca has an ownership interest in the seized funds?  If Jesus Vaca has no -- if you find Jesus Vaca has no ownership interest in the funds, then answer no further questions as to Jesus Vaca and have the presiding juror sign and date this form.  If the jury finds Jesus Vaca has an ownership interest, then answer question two.  Question two:  Do you find that the funds are innocent funds or he had no knowledge or consent?  If no, answer no further questions and have the presiding juror sign and date this form.  And have only one signature and date line.  And then the question three."  The court's summary of the proposed special verdict form did not suggest that question No. 2 could be answered in the affirmative based on the finding that some portion of the currency was innocent and merely "related to" Jesus.  Additionally, the court instructed the jury that it was to answer question No. 3 only if it found "an ownership interest *and* an innocent interest."  (Italics added.)  At no time did the court suggest that the jury could answer question No. 2 in the affirmative if it found some portion of the funds Jesus lacked standing to claim were "related to" him.

Based on the foregoing analysis, the jury's special verdicts were irreconcilably inconsistent.  The jury found that Jesus had an ownership interest in the seized funds (question No. 1), and that his ownership interest was at least in part innocent, or that he lacked knowledge of or did not consent to the illegal use of the funds (question No. 2).  Having made those findings, the jury was legally required to provide an amount greater than zero dollars to return to Jesus.

In support of their posttrial motions, claimants submitted the declaration of a juror who declared that the jury decided not to return currency to Jesus because the currency was "dirty," although the jury agreed Jesus had an ownership interest in the currency and did not have knowledge of or consent to the illegal use of the currency.  The trial court concluded the juror's declaration was inadmissible.  On appeal, claimants contend the declaration should have been considered by the trial court, although they acknowledge that we do not need to do so in order to reverse and remand.  We agree that we need not

17

consider the declaration to reverse and, as a result, also do not need to address claimants' contention that the trial court erred by not doing so.

## V. Remedy

Irreconcilable inconsistencies in a jury's special verdict necessitate setting aside the judgment and granting a new trial. (*Horton*, *supra*, 126 Cal.App.4th at p. 682; see *Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 136 [reversing judgment where special verdicts were fatally inconsistent]; *Missakian v. Amusement Industry, Inc.*, *supra*, 69 Cal.App.5th at pp. 638, 660-662 [where inconsistency between special verdicts cannot be resolved, both are invalid and trial court cannot choose between them].) Here, we cannot resolve the inconsistency between the finding that Jesus had an at least partially innocent interest in the seized currency, and its finding that Jesus was not entitled to a return of any of the seized currency. Consequently, we will reverse the judgment as to Jesus only and remand for retrial.

**DISPOSITION**

The judgment as to claimant Jesus Vaca is reversed, and the matter is remanded for retrial as to his claim. The judgments as to claimants Yessina Vaca and Christian Valle are affirmed. Claimants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
WISEMAN, J.\*

We concur:

/s/
ROBIE, Acting P. J.

/s/
FEINBERG, J.

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19